# Third District Court of Appeal

## State of Florida

Opinion filed June 20, 2018.

————————————

No. 3D16-2624
Lower Tribunal No. 16-12

————————————

**Bechtel Corporation, et al.,**
Appellants,

vs.

**Richard Batchelor, et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, William Thomas, Judge.

Carlton Fields Jorden Burt, P.A., and Sylvia H. Walbolt, and Matthew J. Conigliaro (Tampa); Banker Lopez Gassler, P.A., and Chris W. Altenbernd (Tampa), for appellants.

The Ferraro Law Firm, P.A., James L. Ferraro, Juan P. Bauta, II, Paulo R. Lima, Gabriel S. Saade, and Mathew D. Gutierrez, for appellees.

Before EMAS, LOGUE, and SCALES, JJ.

LOGUE, J.

On Appellee's Motion for Rehearing

We grant rehearing in part, withdraw our prior opinion, and substitute this opinion in its stead.

Bechtel Corporation and Bechtel Construction Company (collectively "Bechtel") appeal a final judgment after a jury trial in favor of Richard and Regina Batchelor. The jury found that Bechtel was liable for Mr. Batchelor's mesothelioma because it was caused in part by exposure to asbestos at Florida Power and Light's ("FPL") Turkey Point power plant, where Mr. Batchelor worked from 1974 to 1980. At that time, Bechtel was a large contractor for FPL, providing services at the power plant. This case illustrates the difficulty in establishing proof of events that occurred well over thirty years ago.

Bechtel raises four issues on appeal, but we write to address two: (1) whether the trial court erred by giving an adverse jury instruction as a discovery sanction, and (2) whether there was sufficient evidence for a jury to find that Bechtel was in possession and control of all or part of the plant such that it owed Mr. Batchelor the same duty that a landowner owes an invitee under the law of premises liability. For the reasons explained below, we reverse on both grounds.

I.     Background

Richard Batchelor was diagnosed with terminal mesothelioma in 2015. The major cause of mesothelioma is exposure to asbestos. In the past, Mr. Batchelor had served on nuclear submarines in the Navy where he was trained as an electrical

technician to maintain gauges used to monitor nuclear power plants. He then joined FPL where he worked as an electrical technician at the Turkey Point power plant from 1974 to 1980 and then at another one of its power plants for two years, until he was promoted to perform budgeting work within an office.

On January 2, 2016, Mr. Batchelor and his wife filed the complaint at issue in this case. The complaint sued twenty-six defendants including, for example, Banner Supply Company, Bennett Auto Supply, Ford Motor Company, Foster Wheeler Energy Corporation, General Electric Company, Genuine Parts Company, Gould Pumps, Inc., Honeywell International, Inc., Union Carbide Corporation, Westinghouse Electric Corporation, FPL, and Bechtel.[1] The complaint gives a short description of each defendant which identifies the asserted basis for liability. Most defendants are described as a company that "manufactured, sold, and/or distributed asbestos-containing products throughout the United States, including Florida, which Plaintiff purchased, used and was exposed to in his life, causing Plaintiff to develop mesothelioma." In contrast, the description for Bechtel alleges that Batchelor "was exposed to asbestos-containing products . . . at power plant(s) that Bechtel . . . operated, directed, controlled and/or managed and/or repaired."

The complaint contains four counts. Count I is labeled "Premises Liability." It names FPL and Bechtel. It alleges Batchelor, as an employee of FPL "was

_____

[1] By the time the trial started, the only defendants left in the case were Bechtel and Foster Wheeler. Foster Wheeler settled on the last day of trial.

3

invited to be on the premises of Defendant, FPL." It further alleges Bechtel, which was "in control of the operations and maintenance of Defendant FPL's power plant(s) upon which Plaintiff performed services, owed Plaintiff a duty to keep the premises in a reasonably safe condition, and owed a duty to Plaintiff to give him timely notice of latent or concealed perils which were known or should have been known."

Count II is labeled "Negligence." It is a products liability negligence claim against "each Defendant who was in the business of manufacturing, selling and/or distributing products." Count III is labeled "Strict Liability." It is a products strict liability claim against the defendants that "manufactured, distributed, supplied, sold and/or placed into the stream of commerce" products containing asbestos. Finally, Count IV was labeled "Loss of Consortium" for Mrs. Batchelor based on the prior Counts.

Because of Mr. Batchelor's medical condition, the case was set for trial on an expedited basis to begin August 22, 2016. On July 2, 2016, Batchelor noticed the depositions of Bechtel's corporate representatives. The depositions took place on August 4 and 5, 2016. Immediately after the depositions were taken, Batchelor moved for sanctions, asserting that Bechtel failed to adequately search for documents and information that might have been provided by retired former

4

employees. In particular, he requested an instruction permitting the jury to infer that such evidence would have been unfavorable to Bechtel.

Five days before trial, the trial court held a hearing on Batchelor's motion for sanctions. In opposition to the motion, Bechtel argued that it had no obligation to seek out former employees from thirty-six to forty-two years earlier and that attempts to locate past employees in similar lawsuits proved fruitless due to the passage of time. The trial court indicated Bechtel could have mailed postcards to the last-known addresses of employees. The trial court had never previously issued an order compelling Bechtel to mail the postcards or otherwise contact past employees. Nor did it have copies of the transcripts of the deficient depositions before it. Nevertheless, the trial court granted the motion for an adverse inference based on Bechtel's failure to attempt to locate former employees.

At trial, Mr. Batchelor testified that he was employed by FPL as an electronic technician responsible for repairing and maintaining the gauges and equipment at the Turkey Point power plant. The plant has a nuclear side and a fossil fuel side, each consisting of two units. From 1974 to 1976, he worked mainly on the nuclear side. He then transferred to the fossil fuel side where he worked from 1976 to 1980.

Insulation covered the various pipes, wires, and equipment at the plant. Some of the insulation contained asbestos. When Mr. Batchelor was required to

work on equipment covered with insulation, he did not remove the insulation himself. Instead, his supervisor called in workers who specialized in removing insulation. FPL itself removed insulation for small jobs, and contractors removed insulation for large jobs.

Mr. Batchelor never worked on equipment while the insulation was being removed. However, he worked in the vicinity of other workers removing insulation. Mr. Batchelor testified "[s]ometimes the insulation is cut away; sometimes it's removable, and I'm right there . . . we're working in amongst others. We're keeping out of each other's way. We're not like in each other's way, but we often work close." The record did not clarify how close Mr. Batchelor worked to others removing asbestos, how often this occurred, or the duration of the occurrences.

When he worked on the fossil fuel side, much of his work was on equipment located outdoors, where there was a lot of dust from many sources. Sometimes he would breathe dust which would cover his clothes and get in his hair. When asked by his counsel if this dust was from the insulation, Mr. Batchelor answered, "It could be from anywhere. It's just dust. I mean, it could be stuff that's been there for months being shaken loose. It could be new dust being created. But it's – there's a lot." He later clarified that at least some of the dust was from insulation: "Yes. Dust from insulation. That's where it settles." There was no direct testimony

6

that the dust contained asbestos, but as mentioned above, there was testimony that some, but not all, of the insulation contained asbestos.

Workers inside the nuclear containment buildings wore safety clothes with respirators. But when Batchelor worked on the fossil fuel side, he was never warned by FPL or anyone else about asbestos. Neither FPL, Bechtel, nor any other contractor provided him with asbestos respirators, safety clothes, safety equipment, or laundry facilities. He could not recall seeing anyone on the fossil fuel side wearing respirators when removing asbestos.

Batchelor's medical causation testimony was provided by Dr. Murray Finkelstein. Dr. Finkelstein never examined Batchelor and never visited Turkey Point. He based his testimony on a review of Batchelor's deposition and published medical studies. Dr. Finkelstein testified that Mr. Batchelor's mesothelioma was caused by exposure to asbestos in three situations. First, he testified that Mr. Batchelor's exposure to asbestos while repairing and sanding brakes was a cause. He reached this conclusion because Mr. Batchelor testified he repaired brakes as a hobby and the medical studies showed a correlation between repairing brakes and exposure to dangerous levels of asbestos.

Second, Dr. Finkelstein testified that Mr. Batchelor's exposure to asbestos when he sanded drywall during a year-long home improvement project was a cause. He reached this conclusion because Mr. Batchelor testified he sanded

7

drywall as part of this project and the medical studies showed a correlation between sanding drywall and exposure to dangerous levels of asbestos. [2]

Finally, he testified that Mr. Batchelor's exposure to asbestos at Turkey Point was a cause. He reached this conclusion because Mr. Batchelor testified he was nearby when insulation at Turkey Point was removed and medical studies showed a correlation between removing insulation containing asbestos and exposure to dangerous levels of asbestos for workers actually removing the asbestos. In making this conclusion, Dr. Finkelstein inferred the insulation that was removed around Mr. Batchelor contained asbestos. Also, even though he knew Mr. Batchelor never removed insulation himself, Dr. Finkelstein assumed Mr. Batchelor was close enough for long enough periods of time to sustain a heightened level of risk similar to the risk of the workers actually removing asbestos. Finally, he assumed Batchelor's exposure to asbestos from all sources at Turkey Point reached toxic levels, although he did not testify to any standard for measuring dangerous levels of asbestos and did not testify that any such standard was violated. Instead, he testified that there is no known safe level of exposure to asbestos.

---

[2] At trial, Bechtel moved to have the verdict form include as Fabre defendants the entities that manufactured the brake linings and drywall that Dr. Finkelstein testified also caused Mr. Batchelor's mesothelioma. The trial judge denied this motion but allowed Bechtel to add FPL and Foster Wheeler as defendants.

In doing so, Dr. Finkelstein did not opine that Batchelor's mesothelioma resulted from exposure to asbestos released into the air by actions of Bechtel. Instead, Dr. Finkelstein testified only that Batchelor's mesothelioma was caused by exposure to asbestos from some source during the six years he worked at the plant.

> QUESTION*:* Do you have an opinion within a reasonable degree of medical certainty whether his exposure to asbestos at Turkey Point between 1974 and 1980 was a substantial contributing cause to his mesothelioma?
>
> DR. FINKELSTEIN: Yes. It is my opinion that exposure such as that would have contributed substantially to the development of his disease of mesothelioma.

Dr. Finkelstein's global approach to medical causation reflected Batchelor's global theory of liability. Under Batchelor's premises liability theory, as he explained in his Answer Brief, Bechtel was liable for the dangers of asbestos dust created by Bechtel "or by others in areas of Turkey Point that were being controlled by Bechtel" (emphasis added). Batchelor thus proceeded under a premises liability theory that Bechtel, as a contractor, exercised such possession and control of the premises that it was liable for asbestos exposure Batchelor sustained from any source at Turkey Point, including asbestos exposure Batchelor sustained as a result of the actions or inactions of Batchelor's own employer, FPL, which owned the plant. One of the major points of contention at trial, therefore,

9

concerned proof of Bechtel's exercise of possession and control of the premises, a requisite element of a premises liability theory.

On this point, the evidence showed that Turkey Point at the relevant time was a large and complex facility. It provided power for all of South Florida. It occupied over three thousand acres and contained two nuclear-fueled units and two oil and natural gas fueled units. The units heated water, which converted into steam and pushed blades of giant turbines. The turbines drove shafts, which powered generators. The steam from the turbines was then recaptured, sent through an extensive cooling system, and reused. On the nuclear side, to avoid contamination, water heated by the nuclear plant was segregated from water converted to steam to drive the turbines. The electricity created was converted by massive transformers on site to a higher voltage for long-distance transmission. Indeed, Turkey point was a wilderness of concrete, wires, pipes, cables, gauges, boilers, and turbines.

To keep the facility operating and secure required a large work force. According to Mr. Batchelor's undisputed testimony, on any given day, there were four hundred FPL employees working on site. And this number did not include the many contractors working on specialized projects which was happening "most of the time."

In addition to FPL employees, the workforce at Turkey Point included contractors. Among the contractors were Bechtel and Foster Wheeler. Foster

Wheeler built and, under contract, maintained the boilers which were described as being the size of a "cathedral." The boilers were lined with insulation.

Bechtel built Turkey Point and was retained under contract—specifically, under two Construction Services Agreements—to provide ongoing maintenance services. The contracts provided that FPL would issue work orders at its discretion to Bechtel and Bechtel would do the work requested on a cost-plus basis. FPL would decide whether FPL or Bechtel would provide needed supplies, equipment, and ancillary services. During the six years at issue, from 1974 to 1980, Bechtel provided 1,050,070 man hours of services at Turkey Point. As discussed below, the contracts required both Bechtel and FPL to carry insurance, with FPL required to provide "Premises-Operation" insurance.

FPL periodically took each of the four units offline for repair and maintenance. During these shutdowns, FPL tasked Bechtel with performing major overhauls on the units; it tasked Foster Wheeler with performing maintenance on the unit's giant boilers, which were lined with insulation; and FPL directed its own employees, including Mr. Batchelor, to perform certain maintenance on the units. Even when contractors were present, which was most of the time, Batchelor received work instructions only from FPL.

Among other things, the jury was instructed: "On Plaintiff's claim, there is a preliminary issue for you to decide. That issue is: Whether at the time and place of

11

the incident in this case, Mr. Batchelor was invited on the premises in the possession or control of Bechtel."

The jury entered a verdict for Mr. Batchelor in the amount of $15,381,724.12 and for his wife in the amount of $6 million. It attributed the fault as follows: Foster Wheeler 5%, FPL 35%, and Bechtel 60%. Bechtel timely moved for directed verdicts and a new trial which were denied. This appeal followed.

II.     Analysis

Bechtel raises four points on appeal: (1) the trial court should have directed a verdict because there was insufficient proof of possession and control; (2) the trial court should have directed a verdict because there was insufficient proof of medical causation; (3) the trial court should have granted a new trial because of the exclusion as Fabre defendants of the entities that manufactured the brake linings and drywall that Dr. Finkelstein testified also caused Mr. Batchelor's mesothelioma; and (4) the trial court should have granted a new trial because the adverse inference jury instruction was reversible legal error. We reach and decide only the first and fourth of these issues.

A. The Adverse Inference Jury Instruction

Bechtel argues that, at the very least, its motion for new trial should be granted because the adverse inference instruction that the judge gave the jury constituted reversible error. We agree. The judge instructed the jury as follows:

> If you find that Bechtel's failure to produce persons employed at Turkey Point between 1974 and 1980 to testify regarding Mr. Batchelor's work at Turkey Point is unreasonable, and that their testimony would have been relevant to Mr. Batchelor's work activities, you are permitted to infer that the evidence would have been unfavorable to Bechtel.

Batchelor defends this instruction as a sanction for Bechtel's failure to properly prepare its corporate representative.

Under Rule 1.310(b)(6) of the Florida Rules of Civil Procedure, a corporation can be required to produce a representative to testify "about matters known or reasonably available to the organization." This places a duty on the corporation to affirmatively prepare its representative "to the extent matters are reasonably available, whether from documents, past employees, or other sources." Carriage Hills Condo, Inc. v. JBH Roofing & Constructors, Inc., 109 So. 3d 329, 334 (Fla. 4th DCA 2013). Batchelor maintains that Bechtel's failure to attempt to locate retired employees who had worked at Turkey Point during the relevant time period—well over thirty years ago—justified the adverse inference.

Adverse inferences are strong medicine: "For the court to tell a jury that an adverse inference may be drawn from the failure to produce evidence invades the province of the jury." Jordan ex rel. Shealey v. Masters, 821 So. 2d 342, 346 (Fla. 4th DCA 2002). Because adverse inferences can invade the province of the jury, such instructions are reserved for circumstances where the normal discovery

13

procedures have gone seriously awry. A good example is <u>Golden Yachts, Inc. v. Hall</u>, 920 So. 2d 777 (Fla. 4th DCA 2006), where the plaintiffs notified a defendant within ten days of an accident to preserve crucial evidence within the defendant's possession and the evidence was subsequently destroyed.

According to the trial court, the sanction here was imposed for Bechtel's failure to attempt to locate retired employees by mailing postcards. Obviously, a party's duty under Rule 1.310(b)(6) includes some reasonable efforts to contact retired employees if current employees cannot provide the information requested. Mailing postcards to locate retirees who had worked over thirty years ago and could then be interviewed to prepare a corporate witness is a time-consuming effort with no guarantee of success. Absent a specific court order to do so, we would not interpret a party's responsibilities to prepare a representative to extend so far, particularly here, where the deposition is noticed to take place only a few weeks before trial when there is reduced time for such a large effort.

The normal rule is that "[a] sanction remedy for failure to allow discovery is legally unavailable to a party until the opposing party is first subject to and violates an order to provide such discovery." <u>Saewitz v. Saewitz</u>, 79 So. 3d 831, 835 (Fla. 3d DCA 2012). <u>See also</u> <u>Chmura v. Sam Rodgers Props., Inc.</u>, 2 So. 3d 984, 987 (Fla. 2d DCA 2008) ("Where a party has never been instructed by the court to comply with any discovery request, sanctions for noncompliance are

14

inappropriate.") (quoting <u>Thomas v. Chase Manhattan Bank</u>, 875 So. 2d 758, 760 (Fla. 4th DCA 2004)).

We see nothing in these facts that would take the matter out of the normal rules. In the absence of an order compelling Bechtel to undertake such an extraordinary effort on the eve of trial which involved so little promise of results, the trial court erred in imposing the sanction of an adverse inference jury instruction. Because of the dearth of evidence discussed in the next section, this error was not harmless. It would require reversal for a new trial, but for our next holding.

### B. Premises Liability

Bechtel next argues that its motion for a directed verdict should have been granted because Batchelor failed to provide sufficient evidence to satisfy the "control" element of the premises liability claim. We agree. There was not enough evidence to allow this question to go to the jury.

One of the unusual aspects of this case is Batchelor's theory of liability. Batchelor did not sue Bechtel under a products liability theory for manufacturing products containing asbestos. Nor did Batchelor sue Bechtel on the theory that Bechtel removed asbestos in a manner that negligently exposed Batchelor to a dangerous level of asbestos. Instead, Batchelor sued Bechtel on the theory of premises liability.[3]

As alleged in Count I of the complaint, which is labeled "premises liability," Batchelor, as an employee of FPL "was invited to be on the premises of Defendant, FPL." Count I further alleges that Bechtel, because it was "in control of the operations and maintenance of Defendant FPL's power plant(s) upon which Plaintiff performed services, owed Plaintiff a duty to keep the premises in a reasonably safe condition, and owed a duty to Plaintiff to give him timely notice of latent or concealed perils which were known or should have been known by Defendant[ ] Bechtel." Under his theory, as Batchelor explained in his brief, Bechtel was liable for the dangers of asbestos dust created by Bechtel "or by others in areas of Turkey Point that were being controlled by Bechtel while Bechtel performed its work at the time Mr. Batchelor was exposed." Batchelor's premises liability theory was that Bechtel, as the party in control of the premises, was liable to warn Batchelor of asbestos dangers created by FPL – Batchelor's own employer – and by FPL's other contractors.

---

[3] Batchelor contends on appeal that its Count II constitutes a general negligent claim against Bechtel. We are not persuaded. While Count II is labeled "Negligence," it is clearly a products liability claim against "each Defendant who was in the business of manufacturing, selling and/or distributing products" because "Defendant's products contained latent characteristics and/or design defects." Nor can Batchelor's argument in this regard be reconciled with the jury instruction that, as a "preliminary issue," required the jury to decide whether "the premises was in the possession or control of Bechtel." A general negligence claim would not require a tortfeasor to be in possession of the premises as a preliminary issue.

16

Under a premises liability theory, "the fact that more than one person is under a duty and one fails to perform is no defense to one who has assumed control." Worth v. Eugene Gentile Builders, 697 So. 2d 945, 947 (Fla. 4th DCA 1997). Batchelor asserted, and the evidence showed, that no one monitored asbestos levels at the plant, warned Batchelor about asbestos, supplied asbestos respirators, distributed asbestos safety clothes, or provided asbestos laundry facilities. Whether or not FPL, as owner of the premises and as Batchelor's employer, had a duty to Batchelor in this regard, Batchelor's theory was that Bechtel, because it was in control of Turkey Point, assumed these duties and was consequently at least jointly and severally liable for their breach.

In order to prove his theory, Batchelor was required to prove that Bechtel controlled the premises. Accordingly, the parties agreed that the jury was instructed that "there was a preliminary issue for you to decide," namely whether "Batchelor was invited on the premises in the possession or control of Bechtel." As the judge said to Bechtel's attorneys at the conference over the verdict form, "if the jury finds that you weren't in possession of the premises, they're going to find no liability."

"Premises liability is not predicated on ownership of the property;" instead, the "duty to protect others from injury resulting from a dangerous condition on the premises rests on the right to control access to the property." Welch v. Complete

17

Care Corp., 818 So. 2d 645, 649 (Fla. 2d DCA 2002) (holding landlord who had surrendered control of access to property entirely to tenant was not liable for failure to protect invitee from dangerous condition on the property). See also Haynes v. Lloyd, 533 So. 2d 944, 946 (Fla. 5th DCA 1988) ("The crux of the cause of action for premises liability is not legal title or ownership, but the failure of a person who is in actual possession and control (be it the owner, an agent, a lessee, a construction contractor, or other possessor with authority and control), to use due care to warn or to exclude, licensees and invitees from areas known to the possessor to be dangerous because of operations or activities or conditions.").

For this reason, control of property for purposes of premises liability means control that rises to the level of the ability to control access or exclude others from the property. "The duty to protect others from injury resulting from a dangerous condition on a premises rests on the party who has the right to control access by third parties to the premises, be it the owner, an agent, or a lessee of the property." Brown v. Suncharm Ranch, Inc., 748 So. 2d 1077, 1078 (Fla. 5th DCA 1999).

Applying these principles to the case before us leads us to conclude that the evidence at trial was not sufficient to support a jury finding that Bechtel possessed or controlled the premises. Batchelor's lack of proof on this key point begins with the complete absence of direct evidence. No witness testified and no document indicated that FPL surrendered, and Bechtel took joint possession of, all or any part

18

of Turkey Point. This lack of direct evidence might be due to FPL's refusal to share with a third party control of any part of Turkey Point which was, after all, a heavily guarded nuclear facility providing electricity to all of South Florida. But it might also be due simply to the over-thirty-year lapse in time from the period at issue to the date of the trial. Whatever the reason, there was no direct evidence on this point at trial.

Instead of direct evidence, Batchelor, as he may, relies on inferences. In particular, he asked the jury to infer that FPL granted joint possession and control based on several circumstances. First, Bechtel was a very large contractor at Turkey Point from 1974 to 1980. Sometimes Bechtel had trailers on site which it used for office space or storage. In fact, Bechtel provided over one million man hours of services at the plant over these six years. This number is impressive, but given Batchelor's own undisputed testimony that the plant was serviced by four hundred FPL employees per day, plus contractors, Bechtel's presence was still a fraction of the presence of FPL's own work force over those six years. The mere fact that Bechtel was a large contractor does not support an inference that FPL transferred the right of joint possession and control of Turkey Point to Bechtel.

Second, Batchelor references the service contracts, which provided FPL would issue future work orders and Bechtel would fill the work orders on a cost-plus basis. Batchelor argues these contracts gave Bechtel "control over the areas

where it performed work." But Batchelor does not direct us to, and our own close reading could not find, any language discussing Bechtel's assumption of possession or control of all or any part of the plant. Unlike, for example, many leases that discuss the relative responsibility of the landlord and tenant to maintain certain areas, the service contracts here are silent regarding any transfer of possession or control.  Cf. Benton Inv. Co. v. Wal-Mart Stores, Inc., 704 So. 2d 130, 133 (Fla. 1st DCA 1997) (where lease provided tenant and landowner had joint responsibility to maintain parking lot, a jury could find tenant breached duty to invitee criminally assaulted in parking lot).

Certainly, the simple existence of a cost-plus contract based on future work orders does not support an inference that FPL shared its right of possession and control of all or part of the premises with Bechtel. If anything, the complete absence in the contracts of any discussion of Bechtel assuming responsibility or control of any part of the premises undercuts any such inference. It is simple conjecture to assume such a contract proves Bechtel assumed control of the plant.

Batchelor points to the sections of the contract providing that upon termination, FPL "shall assume responsibility for and take possession of any work, materials or equipment remaining on the project." While this sentence uses the word "possession," it refers to possession only of "work, materials, or equipment." Notably absent is any reference to possession of the plant or premises. Under the

20

normal principle of interpretation that the expression of one thing intends the exclusion of others, this language does not bolster, but instead undermines, the inference that FPL transferred to Bechtel the right to possession of the premises. Indeed, this is exactly the language one would expect to see in a contract for services that did <u>not</u> transfer control of the premises.

Batchelor also points to the specific provisions in the contracts regarding insurance. The 1978 Agreement, for example, required Bechtel to maintain liability insurance "with respect to the scope of the Bechtel Services." It argues that this insurance requirement indicates that Bechtel assumed control and responsibility for the premises. But the contract also required FPL to maintain comprehensive General Liability Insurance and Excess Liability coverages for personal injury and death for, among other things, "Premises–Operations."

In support of his insurance argument, Batchelor cites <u>Jones v. Basha, Inc.</u>, 96 So. 3d 915, 917 (Fla. 2d DCA 2011), which upheld summary judgment for a landlord based on a finding that the landlord had surrendered control to the tenant. In that case, the Second District held that summary judgment for the landlord was proper because the tenant had failed to create an issue of material fact simply by showing the landlord carried its own liability insurance when the lease expressly required the tenant to carry insurance. We do not believe <u>Jones</u> supports Batchelor's argument. Among other reasons, the contract required FPL to carry

21

"Premises-Operations" coverage. It is a complete non sequitur to assert that a provision requiring FPL to carry insurance for the premises implies the parties agreed that Bechtel would be liable for the premises. In fact, the opposite is true. The inference Batchelor asks us to draw here is not simply speculation, it is illogical. Accordingly, we do not see how these insurance provisions support an inference that FPL was transferring its right of possession and control of all or part of the plant to Bechtel.

Batchelor also points to language in a prior, expired contract between Bechtel and FPL to the effect that Bechtel was required to keep its worksite "safe and proper" and to a subsequent contract that referred to "Bechtel's . . . facilities." But the language of other contracts from other times for other work cannot be read into the contracts at issue in this case. Indeed, even if this language indicated joint possession and control, the absence of such language from the contracts at issue would cut against joint possession and control during the time and places at issue in this case.

Finally, Batchelor points to Bechtel's maintenance work on the power units as evidence of joint possession and control. As discussed above, from time to time, one of the four power units were taken offline for maintenance. During these times, FPL directed Bechtel to perform maintenance work on the units. But also during these times FPL directed Foster Wheeler to perform maintenance work on

the boilers for the units. Additionally, during these times, FPL directed its own employees to perform maintenance on the units, including, apparently, Batchelor. Yet Batchelor very clearly testified that he was never under the control of Bechtel or any other contractor.

That Batchelor performed maintenance work on the units when they were down, at the same time that FPL and Foster Wheeler performed work on the units, does not support an inference that Bechtel exercised the right of possession and control of the units. To the contrary, it appears from the limited evidence on this point that Bechtel did not have the authority to exclude Foster Wheeler or FPL employees from the areas because FPL itself sent Foster Wheeler and FPL employees to work on the units at these times. Here, some direct evidence of how and who controlled the worksite around the units could have tipped the evidentiary balance. But the record is devoid of direct evidence on this point. In the absence of direct or circumstantial evidence sufficient to support a logical inference, the conclusion that Bechtel exercised possession and control is no more than conjecture, speculation, and surmise. It might be true, but it might not be true. On this record, without more evidence, a jury could not make a finding one way or the other. Batchelor, as plaintiff, failed to carry his burden of proof.

As Batchelor admitted in his Answer Brief to this Court, his premises liability case was that Bechtel possessed and controlled the premises to the extent

that it was liable for its failure to warn Batchelor, an FPL employee, of the dangers of asbestos dust created "<u>by others</u> in areas of the Turkey Point power plant that were being controlled by Bechtel." The record in this case fails to include evidence sufficient to make a finding that Bechtel exercised the possession and control of the premises that would make it liable for the asbestos exposure caused by the actions of FPL and others. We are certainly sympathetic to the fact that this lack of evidence may well be due to the simple passage of over thirty years between the trial and the occurrence of the events at issue. But the lack of evidence may also be due to the fact that FPL never permitted a third party to share control and possession of all or part of this nuclear facility. In any event, because of the lack of evidence, Bechtel's motion for directed verdict should have been granted. We reverse with instructions to enter judgment for Bechtel.

Reversed.

SCALES, J., concurs.

EMAS, J., dissenting.

I respectfully dissent, and would affirm the final judgment entered pursuant to a jury verdict in this case, because: 1) the trial court properly determined that sufficient evidence was introduced to permit the jury to decide whether Bechtel had "possession and control" of those portions of the premises where Batchelor was exposed to asbestos during the relevant time period; and 2) the trial court did not abuse its discretion in giving a jury instruction on a permissible adverse inference.

## BACKGROUND

From 1974 to 1980, Richard Batchelor was employed by Florida Power and Light ("FP&L") at its Turkey Point Power Plant in Miami as an instrument and control specialist. On December 4, 2015, he was diagnosed with terminal mesothelioma resulting from exposure to asbestos-containing products. In January 2016, he sued several different companies, including Bechtel Corp. and Bechtel Construction Co. ("Bechtel"), which constructed and thereafter maintained and repaired the nuclear reactors at Turkey Point. Batchelor's wife, Regina, sued for loss of consortium.

At issue is Count I of the operative complaint, which sets forth a premises liability claim and alleges, *inter alia*, that Batchelor was "exposed to asbestos-containing products and/or inhaled dangerous and hazardous asbestos fibers while working with or around asbestos-containing products at power plant(s) that [Bechtel], by and through its agents, employees, representatives and/or others over whom it exercised control, operated, directed, controlled and/or managed and/or repaired."

The case proceeded to a jury trial against Bechtel and one other defendant, Foster Wheeler, another maintenance contractor at Turkey Point.[4] The jury returned a verdict in favor of Batchelor and against Bechtel. Following the verdict, Bechtel moved for directed verdict, entry of judgment as a matter of law, and new trial, all of which motions were denied.

On appeal, Bechtel contends that this court should reverse and remand with instructions to enter judgment in favor of Bechtel as a matter of law, based upon insufficient evidence to establish that Bechtel was in possession or control of FP&L's premises during the relevant time period. Alternatively, Bechtel contends, it is entitled to a new trial because the trial court abused its discretion in giving an adverse inference instruction to the jury. The majority agrees with both of these

---

[4] Foster Wheeler settled with Batchelor the day before trial ended.

26

contentions.  I conclude that neither contention has merit and that we should affirm the jury's verdict and the trial court's final judgment entered upon that verdict.

## 1.  Possession and Control of the Premises

The majority concludes that Bechtel was entitled to a directed verdict because Batchelor failed to prove, as part of his premises liability claim, that Bechtel was in possession or control of a portion of FP&L's premises between 1974 and 1980.

Batchelor contends he did present sufficient evidence on the question of possession or control, such that it was up to the jury to decide whether Bechtel exercised possession or control over the areas in Turkey Point where Batchelor was exposed to asbestos-containing materials.  The record reveals that Batchelor is correct.

A premises liability claim is, at bottom, a negligence claim with the added elements of possession/control of the premises, and notice of the dangerous condition.  See Lisanti v. City of Port Richey, 787 So. 2d 36, 37 (Fla. 2d DCA 2001) (observing: "The elements for negligence are duty, breach, harm, and proximate cause; the additional elements for a claim of premises liability include the defendant's possession or control of the premises and notice of the dangerous condition.").  See also Solomon v. New ERA Meat No. 2, 961 So. 2d 989 (Fla. 3d DCA 2007) (citing Lisanti, 787 So. 2d at 37).

27

While we review the denial of a motion for directed verdict or judgment as a matter of law *de novo*, we must view the evidence and all inferences in a light most favorable to Batchelor. <u>Fasani v. Kowalski</u>, 43 So. 3d 805, 812 (Fla. 3d DCA 2010). "A directed verdict is proper only when the record conclusively shows an absence of facts or inferences from facts to support a jury verdict." <u>Id.</u> <u>See also</u> <u>Regency Lake Apt. Assoc., Ltd., v. French</u>, 590 So. 2d 970, 972 (Fla. 1st DCA 1991) (noting that "[u]nless only one possible conclusion can be drawn from the facts presented, the issues of negligence and probable cause will normally be answerable only by a jury.")

Although Bechtel was an employee of FP&L, it is undisputed that, at Turkey Point, Bechtel installed equipment containing asbestos. When Bechtel performed maintenance at Turkey Point, it would remove insulation and other asbestos-containing materials, which, according to several witnesses, would create airborne asbestos fibers that ended up on Batchelor's clothing and hair, and up his nose.

Bechtel asserts that no evidence was presented that it was in possession or control of Turkey Point because it was there simply as a contractor performing maintenance for FP&L, the owner. This argument belies the evidence presented, ignores the fact-intensive nature of the issue, and fails to recognize the applicable law. The well-settled law in this area eschews labels such as owner (FP&L) or contractor (Bechtel):

28

[A] cause of action for premises liability does not hinge on legal title or ownership, but rather on the failure of the party who is in actual possession or control to perform its legal duty. A party who exercises control or implied authority over a piece of property by inviting people to utilize the property in a particular manner may become responsible to invitees in the same manner as an owner.

French, 590 So. 2d at 974.

As our sister court recognized in Haynes v. Lloyd, 533 So. 2d 944, 946 (Fla.

5th DCA 1988):

The crux of the cause of the cause of action for premises liability is not legal title or ownership, but the failure of a person who is in actual possession or control (be it the owner, an agent, a lessee, a construction contractor, or other possessor with authority or control), to use due care to warn or to exclude, licensees and invitees from areas known to the possessor to be dangerous because of operations or activities or conditions.

See also Verges v. Pacheco & Sons, Inc., 822 So. 2d 542, 543 (Fla. 3d DCA

2002) (quoting Worth v. Eugene Gentile Builders, 697 So. 2d 945, 947 (Fla. 4th

DCA 1997)).

Moreover, Batchelor was not required to show that Bechtel had complete or

exclusive control over the premises in order to establish Bechtel's duty. It was and

remains undisputed that FP&L, and not Bechtel, owned Turkey Point at the time

Batchelor was exposed to asbestos. However, this is merely the starting point of

the analysis. Batchelor contended that Bechtel and FP&L each owed a duty of care

to ensure the safety of Batchelor while he was working on those portions of Turkey

Point over which Bechtel and FP&L had the ability to exercise joint control.

29

Two or more persons or entities can have the ability to exercise possession or control and, if that is the case, either or both may be liable in a premises liability action:

> A duty, and therefore liability for breach of that duty, may rest upon more than one party. Anyone who assumes control over the premises in question, no matter under what guise, assumes also the duty to keep them in repair, and the fact that others are under a duty which they fail to perform is no defense to one who has assumed control, thereby bringing others within the sphere of danger.
> Craig v. Gate Maritime Properties, Inc., 631 So. 2d 375, 378 (Fla. 1st DCA 1994).

Thus the fact that Bechtel was "merely" a contractor working on premises owned by FP&L does not relieve Bechtel of this duty or absolve it of liability: "Contractors may also share responsibility for injuries caused on or around a construction site even though, as in the instant case, the landowner retains some possession and control of the premises." Worth, 697 So. 2d at 947.

At the conclusion of the trial, the trial court properly instructed the jury on these established points of premises liability law:[5]

> Control over property sufficient to establish liability does not have to be complete or exclusive. More than one party may share responsibility, possession, or control over property and each may therefore, be held liable for injuries that occur on the premises.
> Anyone who assumes control over the premises in question, no matter under what guise, assumes also the duty to keep them in repair, and the fact that others are under a duty which they fail to perform is not

---

[5] On appeal, Bechtel does not assert that these instructions were an erroneous statement of the law.

30

[a] defense to one who has assumed control, thereby bringing others within the sphere of danger.

So the question is not (as the majority appears to posit) whether FP&L (as owner) had possession or control of those portions of Turkey Point where Batchelor worked. The answer is most certainly "yes." The question is whether any evidence was presented to permit the jury to determine that Bechtel shared the ability to control those portions of Turkey Point where Batchelor worked and where he was exposed to asbestos. The answer, again, is most certainly "yes."

Importantly, whether a defendant exercises sufficient possession or control over the premises is ordinarily a question of fact to be resolved by the jury. French, 590 So. 2d at 974; Cook v. Bay Area Renaissance Festival of Largo, Inc., 164 So. 3d 120 (Fla. 2d DCA 2015); Florida Power & Light Co. v. Morris, 944 So. 2d 407, 410 (Fla. 4th DCA 2006) (holding: "Generally, control and responsibility are issues of fact to be resolved by the jury.")

Bechtel was the contractor performing construction, maintenance, and overhaul pursuant to two four-year construction services agreements entered into by Bechtel and FP&L during the six- year period (1974-1980) that Batchelor was exposed to asbestos at the Turkey Point Power Plant. The written construction services agreement between Bechtel and FP&L provided that Bechtel was to "perform construction, construction management and related services as requested by FPL from time to time in connection with the Turkey Point Power Plant

31

(Turkey Point Units 1, 2, 3 and 4) . . . ."  The contract included a scope of services

provision, under which Bechtel was to perform, *inter alia*, the following work:

- Steam Generator (hereinafter SG) repair program, including SG unloading facility, SG repair, SG storage compound, nuclear maintenance buildings, containment cranes, and miscellaneous temporary facilities.

- SG protection program, including feedwater heater replacement, moisture separator tube bundle replacement, SG and condenser wet layup systems, condensate polishing system, feedwater recirculation, feedwater demineralization, and feedwater deaeration and condensate storage system.

- Other items of a backfit program, including auxiliary feedwater upgrade, SG blowdown recovery, site security upgrade, condenser retubing, instrument air and breathing air systems modification, and miscellaneous maintenance platforms.

Bechtel was responsible for maintaining and repairing the steam generators, whose component parts included boilers and pipes insulated with asbestos.  The construction services agreement gave Bechtel authority to subcontract or delegate work to affiliates "without the prior approval of FPL." Upon termination of the agreement, FP&L "shall assume responsibility for and take possession of any work, materials or equipment remaining on the Project."

Bechtel was required under the terms of the construction services agreements to maintain extensive liability insurance, including insurance for injury to persons other than Bechtel's employees.

The magnitude of the work performed at Turkey Point by Bechtel cannot be overstated, in terms of either manpower or scope. To illustrate this, Batchelor introduced, without objection, a summary document which showed that *during the four-year period from 1976-80, Bechtel employees worked a total of 1,050,070 man hours at Turkey Point*. Using this million hour figure, the following examples illustrate the average number of Bechtel employees who may have been working at Turkey Point during the relevant time period:

- 126 Bechtel employees working 40 hours a week, 52 weeks a year, for four years.

- 190 Bechtel employees, working 30 hours a week, 46 weeks a year, for four years.

- 220 Bechtel employees, working 30 hours a week, 40 weeks a year, for four years.

As this summary document established, *at a very minimum,* an average of 126 Bechtel employees were working at Turkey Point every single day, Monday through Friday, eight hours a day for four years. This helps reveal Bechtel's pervasive presence on the project.

Batchelor also introduced Bechtel's monthly billing records during this same four-year timeframe. It showed that, in the one month in which Bechtel billed its *fewest* hours (May 1977), it logged 4,483 hours, which amounts to twenty-eight

33

Bechtel employees working full-time at Turkey Point for that entire month. By contrast, in the month where Bechtel billed the most hours (May 1980), it logged 76,098 hours, which amounts to *475 Bechtel employees working full-time at Turkey Point for that entire month*. It can hardly be contended that Bechtel was merely one of many contractors at the Turkey Point power plant during the time period in question. In fact, Bechtel's own corporate representative acknowledged that Bechtel actually built all four of the power-generation units at Turkey Point.

It is thus clear that Bechtel did not simply have a few of its workers show up each day with a tool belt around their waist, perform some work, and then leave. Bechtel was a constant presence at Turkey Point during the relevant maintenance and overhaul time periods. Bechtel was responsible for regular system overhauls, during which the reactors at Turkey Point would have to be shut down. FP&L employees did not perform the shutdown work; instead, it was performed by outside contractors. And as Batchelor testified, Bechtel was "the contractor that did the shutdown work." During these maintenance and overhaul projects, Bechtel hauled in large trailers for use by its hundreds of workers, and utilized cranes to lift and place these large trailers on top of the turbine decks or other areas where Bechtel was performing its work. At these times, Bechtel's employees and the FPL employees, like Batchelor, would work alongside each other, each performing their own duties, but the FP&L workers were not staffed to work on the overhaul.

The evidence described above created, at the very least, an inference that Bechtel had the ability to exercise joint control of those portions of the Turkey Point equipment and premises during the overhaul and maintenance periods, which is when the most significant insulation removal took place and when Batchelor was exposed to asbestos. I do not suggest that the evidence of Bechtel's ability to control portions of Turkey Point was overwhelming. But that of course is not the standard. The standard is simply whether there was *any evidence*, or inferences from the evidence, to show that Bechtel shared responsibility, control or possession of those portions of the premises where Batchelor was exposed to asbestos. I would hold that Batchelor met this low threshold.

Similarly, the question is not whether this panel agrees with the jury's ultimate resolution of that fact-intensive determination. Instead, the question is whether there was sufficient evidence to permit the jury make its determination. I would affirm the final judgment entered by the trial court upon the jury's verdict, and therefore, must respectfully dissent.

## 2. Violation of Rule 1.310 and the Adverse Inference Instruction

I further note my dissent to the majority's determination that the trial court abused its discretion in giving the adverse inference instruction. We review the trial court's rulings on discovery violations, and its decision to give a jury instruction, under an abuse of discretion standard. Toll v. Korge, 127 So. 3d 883

(Fla. 3d DCA 2013). The majority concludes that the trial court abused its discretion in giving an adverse inference instruction as a sanction for violating Florida Rule of Civil Procedure 1.310(b)(6). I believe, however, that the majority opinion fails to view the record below in a light most favorable to affirming the trial court's ruling, and fails to give proper deference to the trial court's action. I believe the trial court properly imposed the sanction and crafted an appropriate permissive adverse inference instruction. Nevertheless, I find it unnecessary to further elaborate, as the majority's determination of this issue is rendered moot (or, at the very least, *dicta*) by the dispositive nature of its holding that the trial court erred in not directing a verdict in favor of defendant on the premises liability claim.

I would affirm the final judgment in this case, and therefore respectfully dissent.